The statement of this case, which was founded on the same transaction as the case last reported, Hollowell v. Skinner, ante, 165, was thus given by the presiding judge:
This was an action of trover for 700 barrels of corn. The plaintiff read in evidence six judgments, amounting, in all to $1,291, against William C. Skinner, taken at August Term, 1840, of Perquimans County Court, and executions thereon to November Term, and proved that a sale by the sheriff under these several executions in September, 1840, the plaintiff purchased the crop of corn at Old Neck, which the defendant afterwards converted to his own use. It appeared in evidence that the defendant, who was the father of William C. Skinner and a wealthy planter, was the owner of the Old Neck plantation, which was about 20 miles from his residence. The plantation was supplied with horses, stock, and farming utensils, and the defendant kept there some 20 slaves. In February, 1837, William, his son, who had just finished his education, went to reside on this plantation, and continued to live there until *Page 136 
the fall of 1840. The wheat crop of 1837, which had been put in by the defendant, was equally divided between the defendant and William. The corn crop of 1837 and the corn and wheat crops of 1838 and 1839, and the wheat crop of 1840, were disposed of by William and the (176) proceeds used by him. Wheat and corn were the only products of the farm made for sale. In 1838 William married. In 1839 and 1840 William employed overseers. During his residence of Old Neck he bought several horses — some to work on the farm, others for riding horses. He purchased, in his own name from the stores, salt, iron, and all other articles needed on the farm, and acted in every respect as if he was the owner of the establishment, but did not sell nor offer to sell the plantation or any of the negroes or any of the stock found there when he went into possession.
Bagley, the sheriff, swore that the sale took place at Old Neck; that the corn was growing in two large fields lying near each other, separated by a fence and a narrow slip of uncultivated land. The river field, containing about 150 acres, was first sold. The sheriff and others attending the sale were inside of the field when it was sold and bought by the plaintiff. The new field, containing about 50 acres, was then put up and sold, the sheriff and others remaining in the river field. The new field was in full view, the nearest part about 250 yards off. This was also purchased by the plaintiff. The corn was sold as it stood in the field.
One Small swore that he was in the spring of 1837 at a sale of the property of Thomas Long, deceased, the defendant and William, his son, and many others, attending the hiring and sale; that the defendant bid for many negroes when offered for sale, but did not get one; that when the purchasers and persons hiring were at the table giving their notes, the defendant observed, as a reason for wishing to hire negroes, that he had given his son William property worth $30,000.
One Hollowell swore that he was the overseer of the defendant at Old Neck in 1836; that in 1837 he and the defendant happened to be at Old Neck together, and were talking about the value of the place; that the defendant said the place was worth $22,000; that he had given it to William; that it was rather more than his share, but it could not be split; that he intended it for William, and should direct in his (177) will that William should refund to the other legatees. This witness also stated that in 1838 he was at the courthouse while negroes were being hired, when a certain negro man was put up; that the defendant inquired for William, saying William wanted to hire this negro; that the defendant then bid off the negro and directed the clerk to put him down to William; that this negro worked that year on the Old Neck plantation; that William managed and spoke of the said plantation as one would of his own property. *Page 137 
One Brothers swore that he was employed by William as an overseer in 1839; that he looked only to William for his wages, though he had not yet been paid.
One Whidby swore that he was employed by William C. Skinner as overseer for the year 1840; that William managed everything as his own, shipped the wheat crop and received the proceeds; that the witness, in August, informed the defendant that, owing to the great indebtedness of William, he was afraid his wages would not be paid, whereupon the defendant employed him to oversee, as his agent, for the remainder of the year, and agreed to seem him paid for the time he had acted as overseer of William; that William was then on a visit up the country, and did not return to Old Neck.
Langley swore he sold William a horse in 1839 for $250, and William said he should be paid out of the next crop.
Brewer swore that he kept a store near Old Neck, and William purchased article from him for his own use and that of the plantation, and that William said on one occasion he considered himself worth $20,000; that his name was at the service of the witness and was good for $20,000.
William C. Skinner, called by the plaintiff, swore that at the time he requested the plaintiff to sign a note to Wood Co., as his surety, he told the plaintiff the note should be paid out of the corn crop of 1840; that Wood Co. were merchants near the Old Neck; that the note was given to settle their store account, and was one of the debts (178) which had been reduced to a judgment, and to satisfy which the sheriff sold the corn crop of 1840; that the debt was about $600. This witness further stated that he had the sole use of the crops after he went to Old Neck, except the wheat crop of 1837; that he bought horses, mules, etc., and managed as if the property was his; that he anticipated the wheat crop of 1840 by a draft, which was endorsed by his father for him; that his father had no knowledge of the debts or of any one of them under which the crop was sold, so far as he knew, but his father on several occasions complained that he was doing badly and was going in debt; that he remonstrated with him, and when he saw a new horse would give him a lecture on economy; that he went to Old Neck in February, 1837, and came of age in June of that year; that when he left school, his father asked him whether he would prefer living at home or going to Old Neck; that he left it to his father, who concluded that he should go to Old Neck, and told him he would give him half of that year's crop, and afterwards would be regulated according as he thought his conduct merited; that no more definite arrangement was ever made.
The witness Brothers further stated that in 1839, while he was William's overseer, the defendant came to the plantation; that William was not at home; that the defendant said he had come to get two of *Page 138 
William's negroes to assist in clearing out a fishing ground; that William had better stay at home and attend to his business, instead of having an overseer; that he had been getting in debt $500 a year ever since he took possession of the place, and that if he did not do better, he would be sold out in a few years; that the defendant then said, "Well, the property will all be sold, and if he can't live with property, he may get along without it"; that the defendant came to the plantation but seldom, and exercised no control when there, except to give advice, etc.
The defendant offered no evidence.
The plaintiff's counsel insisted (1) that from the evidence, William Skinner was the owner of the corn crop, being a tenant from year (179) to year, or, at any rate, a tenant at will, and so entitled to emblements; (2) that William being permitted by his father to enjoy the property as his own, and having acquired credit on the faith of the crops, the defendant would not be permitted to set up his claim and defeat the creditors.
The defendant's counsel contended (1) that William was the mere agent and manager of his father, having no ownership in the property or crops; (2) that supposing the principle of law contended for by the plaintiff's counsel to be correct and applicable to creditors, it was necessary to show that the defendant had knowledge that William was about to contract some one of the debts, under which the property was sold, and permitted him to get credit on the faith of the crops, so far from which it was apparent that the defendant had no such knowledge, but was unwilling and even remonstrated against his contracting debts.
The court charged that if William was the agent or manager of the defendant, the plaintiff could not recover on the first ground, as representing William the debtor, because an agent has no property in the crop, and if injured, must sue on his contract; but if the son took possession — not as agent, but on his own account — with the understanding that the possession was his, and although the title remained in the father, yet he was to have the privilege of using the plantation and negroes and be the owner of what he should make, subject to revocation by the father whenever he should think proper, the son's taking possession would create such a relation between him and his father, whether a tenancy from year to year or a tenancy at will, it was unnecessary to decide, as to entitle the son to a crop which he had planted and cultivated, although it was standing on the ground at the time the father terminated the relation. It was not necessary for rent to be reserved. A father might give his son a stated sum for his support, or he might give him the use of a plantation and negroes for that purpose. If he did so, and the son was at the expense of employing an overseer, hiring negroes, buying horses, etc., although the father might revoke the gift or loan at any time, still *Page 139 
the son would be entitled to the crop which he had been at the (180) trouble and expense of making. Whether the son was the mere agent, or was put in possession on his own account was left to the jury.
The court further charged that if the defendant, by putting the son in possession, enabled him to acquire credit; if the creditors, or any of them, under whose executions the crop was sold, gave credit to the son under a belief that he was the owner of the crops and had a right to dispose of them, and if the defendant knew that his son was enjoying credit and going in debt upon the faith of his being entitled to the crops, and stood by without taking any measures to correct the false impression, he would not be allowed to set up his title to the crop against the plaintiff, who represented the creditors, although the jury should believe the was unwilling for his son to go in debt and remonstrated against his doing so, and although he did not know of his incurring any of the particular debts sued on — on the same principle that one who stands by and sees another buy and pay for his horse is not allowed afterwards to claim him, and one who is in the habit of sending his servant to a store is bound to pay the account, though the master did not send him for a particular article.
The defendant's counsel also insisted that as to the 50-acre field, the sale was void, because the sheriff had no right to sell at the distance of 250 yards.
The court charged that it was not necessary for an officer to go inside of a field in order to sell a growing crop; it was sufficient that he was within view and within such a convenient distance that the persons attending the sale could examine for themselves and know what was offered for sale.
There was a verdict for the plaintiff, and a new trial being refused and judgment rendered according to the verdict, the defendant appealed.
This case arises out of the same transaction (181) which gave rise to that of Hollowell v. Skinner, ante, 165, and, if possible, is clearer for the plaintiff than that was.
If the son was not occupying the plantation as the overseer and servant of the defendant, it must follow that he did so on his own account and for his own benefit. We need not go minutely into the evidence for the purpose of establishing the nature of the occupation; no one can doubt from what the defendant said, and from what he and his son did, and from what they did not do, that the father was setting his son up in the world by giving him the use of the large property of which he put him in possession; accordingly, the young gentleman sold the crops of *Page 140 
three years and appropriated them to his own use without claim or complaint of the father. What overseer or steward would have been allowed to act in that way? Could the father maintain actions against the purchasers of the crops of 1837, '38, and '39 which the son sold? Why not? It is because the father never thought of claiming them, but intended that the son should so dispose of them and appropriate the proceeds; in other words, they were gifts. For the same reason, the crop of 1840, produced during the son's occupation and by his industry, is his, both for the benefit of himself and his creditors. The son's possession began with an express gift of half the crop then growing, "and after that, he (the father) would be regulated as he thought the conduct of the son merited." That is the son's own account of the matter, and he adds "that no more definite arrangement was ever made." This certainly imports that the father might resume the land and negroes when he pleased, but it equally imports that until he should resume them he did not claim the crops that should be made, but that as the first was the son's by express gift so the others should be also. The son planted and cultivated the crop of 1840, to maturity, and therefore that belonged to him; and so the jury, we think, were properly instructed. As the verdict on this ground was, in point of law, right, the judgment must be affirmed, nothwithstanding [notwithstanding], as we said in Hollowell v.(182) Skinner, we do not concur in the opinion as to the quasi estoppel on the defendant.
We also think the sale of the corn in the small field valid. Although the sheriff was not in or immediately at the field, yet he was near enough to be in plain view so that bidders saw for what they were bidding, and that is the purpose of requiring the thing to be present.
PER CURIAM. No error.
Cited: McNeely v. Hart, 30 N.C. 495; Shannon v. Jones, 34 N.C. 208;Perry v. Hardison, 99 N.C. 27.